Per Curiam :
This case was referred pursuant to Buie 45 to Lloyd Fletcher, a trial commissioner o.f this court, with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report filed July 9, 1963. Plaintiff failed to file a notice in writing of intention to except to the commissioner’s findings or recommendation within the 15-day period provided therefor in Buie 46(a) and, on September 16, 1963, pursuant to the provisions of said Buie, defendant filed a motion that the court adopt the commissioner’s report as the basis for judgment, to which motion plaintiff has failed to respond, the time for doing which having expired. The case was submitted to the court without oral argument. Since the court is in agreement with the findings and recommendation of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore entitled to recover from defendant the sum of one thousand six hundred ninety-six dollars and seventy-one cents ($1,696.71) and judgment is entered for plaintiff in that amount.
OPINION OE COMMISSIONER
This case involves the jato which, as Chief Judge Jones once remarked about another military article, “having been everywhere else, is now in court.” See Union Pacific Railroad Company v. United States, 117 Ct. Cl. 534, 543; 91 F. Supp. 762. Like the Jeep (to which the Chief Judge referred), the jato has not only been an exceedingly useful device to the armed services but it has also accompanied them, particularly with their aircraft, all over the world, jato is an initial-letter contraction of the phrase “Jet Assisted Take Off.” In the words of the Army Technical Manual TM-9-1955:
jatos were initially developed to provide the additional “punch” required on normal takeoff by augmenting the power supplied by the plane’s own propulsive system * * *.
*268 While such additional “punch” is normally required for only a short period of time, it can be of critical importance to the accomplishment of a safe takeoff by a heavily loaded aircraft from a restricted area, such as the flight deck of an aircraft carrier. In addition to such use with aircraft, the jato has been successfully applied to the launching of missiles and target devices, the propulsion of explosive “snakes” into position for mine-clearing purposes, and the propulsion of high speed sleds, automobiles, and amphibious vehicles.
Despite its utility, the people who use it and those who transport it have encountered difficulty in agreeing on how to describe the jato. The court is now called upon to resolve the disagreement by providing the answer to the question of whether, for purposes of a classification rating under the National Motor Freight Classification, jatos are “High Explosives, N.O.I.,” as claimed by plaintiff-carrier, or are “Eocket Motors,” as claimed by defendant-shipper. To the parties, the importance of the answer to this question lies, of course, in the fact that the transportation rates applicable to the shipment of high explosives are higher than those applicable to the shipment of rocket motors.
As one of numerous common carriers so engaged,[1] plaintiff transported 'by truck 85 shipments of jatos for the Departments of the Army, Navy, and Air Force during the period December 28,1954 to February 4, 1959.[2] These shipments were variously described by the Government on its bills of lading in the f ollowing language:
(a) (Jet Thrust Units, Jato) Explosive Bombs
(b) Jet Thrust Units (Jato Class A) (Eockets, Motor)
tc) Jet Thrust Units Class A (Eocket Motors)
(d) Jet Thrust Units, Jato, Class A (Explosive Bombs by Analogy)
(e) Jet Thrust Units Class A Explosive
(f) Jet Thrust Units (Eocket Motors) Explosive Placard Applied
(g) Explosive Bombs (Jet Thrust Units Class A — Jato)
*269 (h) Jet Thrust Units Class A Explosive (Bombs Explosives)
Upon completion of the transportation services, plaintiff presented its bills therefor with charges computed on rates applicable to “High Explosives.” Defendant paid those bills as presented. On post-audit, however, the General Accounting Office decided that the transportation charges should have been computed on rates applicable to “Kocket Motors” and determined, accordingly, that plaintiff had been overpaid. The overpayments thus determined were deducted by defendant from subsequent bills submitted by plaintiff for other transportation services. Plaintiff here seeks recovery of the amounts so deducted, and the parties are agreed that, if the court should determine that plaintiff’s position is correct, then plaintiff is due from defendant the sum of $14,394.62. On the other hand, if defendant’s position is determined to be the correct one, there is due plaintiff only the sum of $1,696.71.
Since the transportation charges for these shipments are computed on the basis of a rating and rate provided in plaintiff’s tariffs as published and filed with the Interstate Commerce Commission, the problem presented becomes one of tariff interpretation.[3] During the years in question, the jato by that specific name was not to be found in the National Motor Freight Classification (NMFC) No. A-2. Plaintiff asserts that the Class A jatos involved herein are high explosives and that, therefore, they are properly ratable under NMFC Item 35440, reading in pertinent part as follows:
explosives, see Buie 27:
High, noi, in barrels or boxes, * * *; or Low, noi, including Black Powder, in barrels, boxes or powder kegs.
On the other hand, defendant asserts that jatos of whatever class are merely specialized types of rocket motors and that they, therefore, are properly ratable under NMFC Item 3870-A, reading as follows:
*270 ammunition, Explosive, Incendiary or Gas, Smoke or Tear Producing, see Note, item 3810
$ $ $ $ *
Cartridges, cannon, blank; or Eocket Motors.[4]
The evidence in this case clearly demonstrates that, from a purely scientific and engineering viewpoint, the jato is simply a rocket motor adapted to specialized uses. When it was originally developed in the laboratories of the California Institute of Technology, the basic scientific principle used was the fundamental one of rocket propulsion. When various types of materials, known as “propellants”, are ignited within a combustion chamber, gases at high temperatures and pressures are generated. Upon the escape of these gases through an exit nozzle, or nozzles, thrust is provided which pushes the chamber forward under the principle of Newton’s third law of motion, i.e., that any action on an object is accompanied by an equal and opposite reaction.
However, the fact that to the scientist or engineer the jato is merely a type of rocket motor does not end the present inquiry. Just as, in another connection, the Supreme Court has felt it necessary to classify tomatoes as “vegetables” despite their botanical classification as “fruits” (Nix v. Hedden, 149 U.S. 304), so here the court must determine whether for transportation purposes the jato is properly to be classified under some designation other than its scientific name.
As set forth at length in the findings, until at least February 7, 1958, the Army, Navy, and the Air Force (the major shippers of jatos) treated rocket motors and jatos separately in their various technical manuals, freight classification guides, shipping handbooks, and supply catalogs. See findings 11 and 13, infra. For example, the Navy Ordnance Shipping Handbook distinguished between Class A jatos, Class B jatos, and Eocket Motors as follows:

*271

Such, separate treatment of jatos and rocket motors by the armed services created considerable confusion within the transportation industry. In the spring of 1957, following some earlier hearings the National Classification Board issued an advisory bulletin to its industry stating that in its opinion the rating for rocket motors was properly applicable to jatos, but about seven months later the Board canceled that bulletin because it felt that it had not been furnished the complete facts and stated:
It now appears that there exists in the minds of many a complete state of confusion as to what are and are not properly identifiable as Jato units or Rocket Motors.
In its brief to the commissioner, defendant “freely admits” the above described separate listings in military publications on jatos and rocket motors. But it insists that such publications are relevant to the present controversy only insofar as they show that in its construction, function, and use, the jato is identical to the rocket motor. It is true, as defendant observes, that the technical manuals describe the jato as “a rocket motor” or as “similar to a rocket motor.” See Army TM-9-1955 and TM-9-1970-2, extensively quoted in findings 9 and 14, infra. From this fact, and from the general scientific consensus above noted, defendant submits that the mere separation between the two articles as they appear in the technical manuals and other publications is an irrelevant fact in the present controversy because “the true test for classification purposes is the character of the article shipped.” Buch Express, Inc. v. United States, 132 Ct. Cl. 772, 777; 132 F. Supp. 473 (1955), cert. den. 351 U.S. 940.
*272 If plaintiff’s case depended merely on the fact that jatos and rocket motors were listed and treated separately in the various military publications, it would be unnecessary to pursue the matter further. There can be little doubt that from Buch Express, supra, and the numerous Interstate Commerce Commission decisions referred to therein, that the classification of an article for transportation purposes must depend upon its actual nature and character. In making that determination, it is proper to consider several factors, no single one of which can be said to be controlling. For example, the function and use of an article may properly be considered in determining its proper classification. Union Pacific Railroad Company v. United States, supra. However, standing alone, the function and use will not be controlling. Buch Express, Inc. v. United States, supra; Patterson Foundry and Machine Company v. C.B. & Q. R.R., et al., 262 I.C.C. 339; C. F. Lytle Co. v. A.T. & S.F. Railway Co., 273 I.C.C. 539; Markstein v. Missouri Pac. R. Co., 243 I.C.C. 345; Chemi Products Co. v. Springmeier Shipping Co., 266 I.C.C. 263. Likewise, the shipper’s description of the goods on the bill of lading, or the manufacturer’s description of the commodity for sales purposes, may properly be considered but will not control the determination of classification. United Welding Co. v. Baltimore & Ohio R.R. Co., 196 I.C.C. 79; Penn Facing Mills Co. v. Ann Arbor R. Co., 182 I.C.C. 614; Northern Pump Co. v. Chicago M. St. P. & P. R.R. Co., 190 I.C.C. 421.
With but one exception discussed below, the application of the foregoing principles to the present case leads unerringly to the conclusion that jatos are rocket motors. They are identical in construction and function, have similar uses, and are so considered by those who design and manufacture them. Hence, even though they may contain high explosive propellants, as completed articles of military hardware, they are clearly “Kocket Motors” which specific classification appears only in NMFC Item No. 3870-A. The Interstate Commerce Commission has held on several occasions that where an article in dispute seems fairly to fall within two different descriptions, the specific description must be upheld over the general description. See Mid-West Chandelier Co. v Pitts *273 burgh & L.E.R. Co., 225 I.C.C. 509, 512 and Lockport Fittings Co. v. Akron, C. & Y. Ry. Co., 241 I.C.C. 653, 657. To use the words of Judge Madden in Union Pacific Railroad Company v. United States, 117 Ct. Cl. 757, 93 F. Supp. 617:
A sound principle in the application of scheduled freight rates to particular commodities is that if, though either of two or more classifications would fit the commodity in question, one of them fits it better than the other or others, that one will be applied. 117 Ct. Cl. 764.
Also, it should be observed that despite the explosive nature of the propellants inserted in its chamber, the completed article known as a jato is actually something different from a high explosive as such. Since its end use is to furnish thrust or “boost” for another vehicle (such as an aircraft) without destroying or damaging that vehicle, the jato is not designed or manufactured for the purpose of producing an explosion but rather for the purpose of generating gas under high pressure by controlled burning. As the Interstate Commerce Commission has stated in another connection “* * * the articles shipped were more than high explosives; they were completed ammunition, only a small part of which consisted of high explosives.” Great Northern Railway Co. v. United States, 311 I.C.C. 96. See also Durez Plastics & Chemicals, Inc. v. Chicago, M. St. P. & P. RR. Co. 263 I.C.C. 1 where the Commission refused to call an article a “chemical” simply because it contained some chemical ingredients.
Without more, it would seem clear that the shipments here in controversy were rocket motors properly classifiable under NMFC Item No. 3870-A. Plaintiff insists, however, that there is more and points to the fact that the defendant itself designated the shipments on the bills of lading as detonating explosives of maximum hazard, namely, Class A. Because of such designation, plaintiff was required to observe numerous safety precautions, placarding requirements and loading restrictions. See Explosives and Dangerous Articles Tariff No. 8, Secs. 77.823, 77.848 and I.C.C. Safety Regulations in *274 49 C.F.R. Secs. 190.30, 191.5, 192.3 and 197.1. Judge Laramore commented in Buch Express, Inc., supra, at p. 777:
In all bills of lading prepared by Army personnel, these shipments were described as radio equipment. There is no evidence that the shipments were deliberately described incorrectly and the equipment having been manufactured by the Army according to Army specifications, it would seem that the Army was best qualified to describe the characteristics of it. [Emphasis supplied.]
Similarly, in the present case, defendant’s representatives were “best qualified to describe the characteristics” of the jato. They did so on the bills of lading by designating the shipments as containing the most hazardous class of explosive. Therefore, it would be manifestly unjust, says the plaintiff, to allow defendant now to say that the articles shipped were actually something else.
Appealing as this argument may seem, it must be rejected for several reasons. In describing these shipments as Class A explosives rather than simply as rocket motors, defendant’s representatives were merely complying with the requirements of Section 3, Rule 2 of NMFC No. A-2, reading as follows:
Explosives or Dangerous Articles Descriptions Must be Shown
Sec. 3. Articles indicated as explosives or as dangerous articles in Motor Carriers’ Explosives and Dangerous Articles Tariff No. 8, American Trucking Associations, Inc., Agent, MF-I.C.C. No. 5? supplements thereto or reissues thereof, must be described on the bill of lading as shown in that tariff and in addition should show the tariff description in connection with which the applicable rating or rate is published when such descriptions differ.
jatos containing Class A explosives are “indicated as explosives” in the Explosives and Dangerous Articles Tariff No. 8 and therefore were required by Section 3 to be so described on the bills of lading in addition to the tariff description. But this requirement is concerned with the matter of safe transportation of explosives and other dangerous articles. It is not concerned with rate classifications. The purpose of the I.C.C. regulations in this area is to minimize the dangers to life and property incident to the transporta *275 tion. of explosives and to state the precautions that must be observed by shippers in preparing them for shipment. See section 73.1(a) of the aforesaid Tariff No. 8.
In United States v. Gulf Refining Company, 268 U.S. 542, the Supreme Court held that the description of freight for purposes of the Commission’s explosive and dangerous articles regulations did not establish the item’s identity under a railroad’s tariff. The Court said at page 550:
The purpose of the regulations was to require a disclosure of the character of the shipment, having regard not to rates but to the dangers to be guarded against.
Likewise, in the case of Chicago, B. & Q. RR. Co. v. United States, 73 Ct. Cl. 250, cert. den. 287 U.S. 599, this court stated at page 260:
It is not disputed that these regulations (I.C.C. Regulations for the Transportation of Explosives and Other Dangerous Articles) were followed. As regards the shipment here in controversy they do not govern the rate, but are merely for the purpose of guarding carriers and the public generally against improper handling and shipment of explosives. United States v. Gulf Refining Co., 268 U.S. 542. It can not be said that were the regulations violated the shipment would take any lower rate. How, then, can it be said that conscientious observance of the regulations has the effect of imposing a higher rate ? Compliance with the rules and regulations of the Interstate Commerce Commission can not make the shipment other than what it is.
Furthermore, it is important to note that NMFC Item No. 3870-A places no qualification on “Rocket Motors” as to their size, type of propellants, or degree of hazard. The item of “Rocket Motors” was placed without restriction in the NMFC after hearings before the National Classification Board. From the history of the item, as detailed in findings 5 and 12, infra, it appears that by reason of information furnished by the armed services, the Board thought that in its consideration of rocket motors it was dealing solely with Class B explosives. The fact remains that, whatever may have been in the minds of the board members, no effort was made to qualify the term “Rocket Motors,”
*276 Accordingly, it is clear, as plaintiff’s traffic manager frankly admitted, if jatos are in fact rocket motors, then NMFC Item No. 3870-A applies to them without regard to their class of propellants. Since the record in this case demonstrates beyond doubt that jatos are in fact rocket motors, it must be concluded that defendant’s NMFC Rule 2 description of them on the bills of lading as Class A explosives is immaterial to a determination of the proper rate classification.
Finally, the court is advised that the precise issue herein has been resolved recently in favor of defendant in two United States District Court cases. T.I.M.E. Freight, Inc. v. United States, Civil Action Nos. 2710, 2711, and 2712, United States District Court for the Northern District of Texas, Lubbock Division; and United States v. B. & M. Track Line, Inc., Civil Action No. 9784, United States District Court for the Northern District of Alabama. Southern Division. Both cases involved jato shipments under bills of lading similar to those herein, and each court concluded that NMFC Item No. 3870-A was applicable. In so holding, it does not appear that either court rendered a formal opinion but merely entered its findings and conclusions. It would seem highly probable, however, that, in deciding as they did, these courts properly applied the principles laid down by a leading transportation case decided by the United States Court of Appeals for their circuit, namely, United States v. Strickland Transportation Company, Inc., 200 F. 2d 234 (5th Cir. 1952). In that case the issue was whether for a shipment of aircraft internal combustion engines there should be applied the NMFC rating for “Machinery, or Machines or Parts Named' — Engines, steam or internal combustion, NOI” or the NMFC rating for “Aircraft or parts named — Aircraft parts, NOI * * In holding that the former rating applied, the court stated:
We think this rating is the proper one because it more precisely describes and better fits the shipments in question than does the rating for which appellee contends; that, in short, it is the more specific and, therefore, the controlling rating.
We think this is so, too, because, if it be considered that the shipment could come under either of the twq *277 classifications, the shipper was entitled to the “Machinery or Machines” classification because the rate prescribed by it is the lower.
Finally, we think appellant has the right of it because, if it could be considered that there is an ambiguity in the tariff and it is not made clear under which rating the articles shipped come, the ambiguity must be resolved in favor of the shipper, and the lower rate must be awarded to him.
When each of the foregoing tests is applied to the facts of the present case, it becomes apparent that, as claimed by defendant, NMFC Item No. 3870-A is applicable to the shipments in controversy. The phrase “Rocket Motors” more precisely describes and better fits jatos and, in addition, is more specific than the phrase “High Explosives, NOI.” Also, even if jatos could properly come under either of the two classifications, or if there is an ambiguity in the tariff, since “Rocket Motors” specifies the lower rate, the shipper is entitled to have it apply to these shipments. United States v. Gulf Refining Co., supra, and Buch Express, Inc. v. United States, supra.
It is unquestionably true that the plaintiff-carrier must sustain the burden of proving the correctness of its charges. United States v. New York, New Haven & Hartford R. Co., 355 U.S. 253; Southern Pacific Co., v. United States, 272 U.S. 445; Buch Express, Inc. v. United States, supra. In my opinion, the plaintiff here has failed to meet that burden, and, accordingly, it is recommended that the court enter its judgment for plaintiff only in the stipulated lower amount of $1,696.71.
FINDINGS OF FACT
1. The stipulated issue in this case is (1) whether the classification rating prescribed in Item 35440 of the National Motor Freight Classification on “High Explosives, N.O.I. (not more specifically described in Classification) ” as claimed by plaintiff, or (2) whether the classification rating prescribed in Item 3870-A of the National Motor Freight Classification on “Rocket Motors,” as claimed by defendant, is applicable to the shipments in controversy which were *278 transported by plaintiff for defendant between December 28, 1954, and February 4, 1959.[5]
2. Plaintiff is a corporation organized and existing under tlie laws of the State of North Carolina, and is a common carrier of property by highway in interstate commerce.
3. During the years 1955, 1956, 1957, 1958, and 1959, the plaintiff performed freight service for the defendant by transporting for account of the Departments of the Army, the Navy, and the Air Force, on the dates and between the points of origin and destination shown in Schedule A attached to the petition, 85 shipments variously described on Government bills of lading as follows:
(a) (Jet Thrust Units, Jato) Explosive Bombs
(b) Jet Thrust Units (Jato Class A) (Eockets, Motor)
(c) Jet Thrust Unit Class A (Eocket Motors)
(d) Jet Thrust Units, Jato, Class A (Explosive Bombs by Analogy)
(e) Jet Thrust Units Class A Explosive
(f) Jet Thrust Units (Eocket Motors) Explosive Placard Applied
(g) Explosive Bombs (Jet Thrust Units Class A— Jato)
(h) Jet Thrust Units Class A Explosive (Bombs Explosives) [6]
All the bills of lading contained either typed words or stamped words reading variously, “explosive placards applied,” “explosives,” “dangerous placards applied,” or “dangerous.”
4. Plaintiff, as destination carrier, submitted bills to defendant and was paid transportation charges for the services performed on the basis of rates applicable to “High Explosives, N.O.I. (not more specifically described in Classifica *279 tion * * *).” Thereafter, upon post audit by the General Accounting Office, it was determined that plaintiff had been overpaid on the ground that the transportation charges should have been computed using rates applicable to “Rocket Motors.” The amounts thus determined as overpayments were deducted from other transportation charges due plaintiff. These payment and audit actions were taken pursuant to the provisions of Section 322 of the Transportation Act of 1940, 49 U.S.C.§ 66.
5. Item 3870-A of the National Motor Freight Classification No. A-2, as amended by Supplement No. 6, effective December 28,1954, reads:
ammunition, Explosive, Incendiary or Gas, Smoke or Tear Producing, see Note, item 3810:[7]
Cartridges, cannon, blank; or Rocket Motors.
Prior to its amendment by Supplement No. 6, the aforesaid item read as quoted above except for the words “or Rocket Motors.” Those words were added by Supplement No. 6 to Item 3870 because during conferences and hearings held in 1954, representatives of the armed services had informed members of the National Classification Board that the hazard characteristics of rocket motors were the same as those borne by “Cartridges, cannon, blank.” The latter articles were carried in the Explosives and Dangerous Articles Tariff as Class B explosives.
Item 35440 of the National Motor Freight Classification No. A-2, effective July 7, 1954, reads:
explosives, see Rule 27:[8]
* * * * *
*280 High, noi, in barrels or boxes, * * *; or Low, noi, including Black Powder, in barrels, boxes, or powder kegs.
Under the general heading of ammunition, Item 3840 of said freight classification No. A-2 reads:
Bombs or mines.
6. Buie 2 of the National Motor Freight Classification No. A-2,[9] reads as follows:
DESCRIPTIONS ON BILLS OP LADING AND INSPECTION OP PROPERTY
Commodity Descriptions Should Conform
Sec. 1. To insure the assessment of the correct freight charges and avoid infractions of Federal and State laws, shippers should acquaint themselves with the descriptions of articles in the tariffs under which they ship; and commodity descriptions in shipping orders and bills of lading should conform to those in the applicable tariff, including packing specifications where different rates are provided on the same article according to the manner in which it is prepared for shipment. Shipping orders and bills of lading must specify number of articles, packages or pieces.
Inspection of Property
Sec. 2. When carrier’s agent believes it necessary that the contents of packages be inspected, he will make or cause such inspection to be made, or require other sufficient evidence to determine actual character of the property. When found to be incorrectly described, freight charges must be collected according to proper description.
Explosives or Dangerous Articles Descriptions Must Be Shown
Sec. 3. Articles indicated as explosives or as dangerous articles in Motor Carriers’ Explosives and Dangerous Articles Tariff No. 8, American Trucking Associations, Inc., Agent, MF-I.C.C. No. 5, supplements thereto or *281 reissues thereof, must be described on the bill of lading as shown in that tariff and in addition should show the tariff description in connection with which the applicable, rating or rate is published when such descriptions differ.[10]
Eule 14 of said National Motor Freight Classification reads as follows :
Classification by Analogy
The rating for any article not provided for, either by its specific name or embraced in an NOI item, shall be the rating provided in this classification or supplements thereto for an article which, in the carrier’s judgment, is the most closely analogous. In such cases, facts must be reported to the Chairman of the National Classification Board through the traffic officer of the carrier in order that the establishment of specific provisions may be considered. This rule will not apply in connection with ratings or rates published in exceptions to this classification or in commodity tariffs.
7. In Motor Carriers’ Explosives and Dangerous Articles Tariff No. 8, effective April 14, 1954, explosives are divided by Section 73.52 into the following classes:
(1) Class A explosives; detonating or otherwise of maximum hazard.
(2) Class B explosives; flammable hazard.
(3) Class C explosives; minimum hazard.
Section 72.5 of the said Explosives and Dangerous Articles Tariff which is entitled “List of Explosives and Other Dangerous Articles” lists jet thrust units as follows:

Article Classecl as

Jet tlirust unit (jato), Class A-----------------------Expl. A.
Jet thrust unit (jato), Class B_______________________Expl. B.
Eocket Motors, as such, are not specifically listed in Section 72.5 of the Explosives and Dangerous Articles Tariff, but are referred to as a part of rocket ammunition in Section 73.53 (p) under definitions for Class A explosives and in *282 Section 73.88(c) under definitions for Class B explosives. Docket ammunition is specifically listed in Section 72.5, and the explosive classification depends upon the type of projectile used with the rocket ammunition.
The following are pertinent provisions of the rules applying to shippers as contained in the said Explosives and Dangerous Articles Tariff No. 8:
Section 73.7. Shipments of explosives or other dangerous articles offered by or consigned to the Departments of the Army, Navy, and Air Force of the United States Government, must 'be packed, including limitations of weight, in accordance with the regulations in this part or in containers of equal or greater strength and efficiency as required by their regulations.
* * * * *
Section 73.53 (t). Jet thrust units (jato), Class A. Jet thrust units (jato), class A, are metal cylinders containing a mixture of chemicals capable of burning rapidly and producing considerable pressure. Under certain conditions the chemical fuel with which the unit is loaded may explode. J et thrust units are designed to be ignited by an electric igniter. They are used to assist aeroplanes to take off.[11] Section 73.79. J et thrust units (jato), class A.
(a) Jet thrust units (jato), class A, must not be shipped with igniters assembled therein unless shipped by, for, or to the Departments of the Army, Navy, and Air Force of the United States Government. * * * These units must be packed in outside containers complying with the following specifications:
(1) Spec. 14,15A, 15E, or 16A * * *. Wooden boxes or wooden boxes, fiberboard lined.
(b) Jet thrust units (jato), class A, packed in any other manner must be in containers of a type approved by the Bureau of Explosives.
(c) Each outside package must be plainly marked “jet thrust units, class a.”
•J* *1» # $ $
Section 73.88(e). Jet thrust units (jato), class B, are metal cylinders containing a mixture of chemicals capable *283 of burning rapidly and producing considerable pressure. Jet thrust units are designed to be ignited by an electric igniter. They are used to assist aeroplanes to take off.[12]
8. Department of the Army Technical Manual TM-9-1950 issued in February 1958, is entitled “rockets” and states under “General Discussion” of rockets as follows:
* * * A military rocket consists essentially of a head, fuze, and a motor. * * * The motor comprises the elements necessary to propel the rocket, including the propellant charge, nozzle or nozzles, and means of igniting the propellant.
*****
A rocket motor is that component which propels the rocket and is assembled to the rear of the head or of a, base detonating fuze. It consists of a steel tube which is closed at the forward end by its attachment to the head or base detonating fuze. In some types, the tube is^ constricted at the rear end to form the throat of a single nozzle. In other types, there are several nozzles located in the base. The motor contains the propelling charge, the propelling charge support, and the igniter. The Sight of the rocket is stabilized by fins attached to the rear of the motor, or by the rotation of a rocket about its axis, called spin. This spin is produced by the reaction of the gas passing at high velocity through the base nozzles, the axis of which are at an angle but not in the same plane as the axis of the motor. The openings in the motor are sealed for protection against the entrance of dirt and moisture by closures (fiber, metal, plastic or other type disks) which are blown out when the rocket is fired. * * *
*****
* * * If rockets are handled roughly at low temperatures, the propellant may crack creating more burning-surf ace causing higher pressure to build up in the motor and erratic ranges. In extreme cases, the motor may detonate. * * *
9. Section II of Department of the Army Technical Manual TM-9-1955, issued in September 1955, is entitled “jatos, general,” and states in pertinent part:
The term jato, derived from the initial letters of Jet Assisted Take-Off, designates a device * * *, similar *284 to a rocket motor, that produces a thrust of limited duration. It consists essentially of a combustion chamber (body) that contains a propellant, means for ignition, and one or more nozzles to control the escape of the products of combustion produced when the propellant burns. The thrust results from the reaction of the products of combustion being accelerated to a very high velocity in the nozzle (nozzles) and continues until the propellant is consumed * * *. jatos may be designed to use either liquid or solid propellants, but those intended to furnish thrust for comparatively short duration and for a single firing are more commonly designated to use only solid propellants. * * *
* * * * *
The power required to bring a loaded airplane up to flying speed while the plane is still on the ground is much greater than that required to keep the plane aloft; the additional power is required only for a short time, jatos were initially developed to provide the additional “punch” required on normal takeoff by augmenting the power supplied by the plane’s own propulsive system; jatos have since been applied for additional purposes, * * *
jatos, in varying sizes, are designed to permit the takeoff of airplanes from small emergency fields or from the decks of aircraft carriers; to launch target aircraft; to launch missiles and to propel explosive “snakes” into position on mine fields for mine-clearing purposes. They have also been applied to high-speed sleds, amphibious military vehicles, and high speed automobiles. In the launching of missiles, a jato that travels with the missile and functions only during the acceleration period is termed a “booster unit,” whereas one used to power the missile during the remainder of its flight is called a “sustaining unit.”
TM-9-1955 requires that in packing jatos for shipment, the containers must be marked with the Interstate Commerce Commission shipping designation which is explained as follows:
For jatos, this is jet thrust units — class a or jet thrust units — class b, dependent upon the classification of the propellant as either a class A or B explosive hazard.
*285 10. The expert testimony and documentary exhibits in this case clearly establish that, from a scientific and engineering standpoint, jatos are rocket motors designed for specialized uses. In the words of one scientific expert, “all jatos are rocket motors, but all rocket motors are not jatos.”
The jato was originally developed in the 1940’s at the California Institute of Technology in a laboratory under the general direction of the late Theodore von Karman. The basic scientific principle used was the fundamental one of rocket propulsion. When various types of materials, known as “propellants”, are ignited within a combustion chamber, gases at high temperatures and pressures are generated. Upon the escape of these gases through an exit nozzle, or nozzles, thrust is provided which pushes the chamber forward under the principle of Newton’s third law of motion, i.e., that any action on an object is accompanied by an equal and opposite reaction.
Neither the jatos nor their propellants are designed or manufactured for the purpose of producing an explosion but rather for the purpose of generating gas under high pressure by controlled burning. If they were to function by explosion, their underlying purpose would be defeated since the probable effect of such explosion would be to destroy the aircraft, missiles, sleds, or other devices to which they were attached. However, a Class A jato will respond explosively to a number eight blasting cap, whereas a Class B jato will not so respond.
11. Despite the agreement among scientists and engineers that the jato is a rocket motor, there appears to have been considerable uncertainty in this regard among Government shippers, carriers, and their representatives. For example, the Freight Classification Guide (Commercial Traffic Bulletin No. 16), issued on February 18, 1950, by the Army and the Air Force, listed several types of rocket motor but no types of jato or Jet Thrust Unit. Then, on November 16, 1954, Change 1 to the Freight Classification Guide was issued, and it treated jatos and rocket motors as separate articles for purposes of freight nomenclature, as follows:

*286

It will be noted from the foregoing table that by its Change 1, the Freight Classification Guide made a distinction, with respect to both nomenclature and the NMFC Item number, between Rocket Motors and Class B jatos, on the one hand (Item No. 3870, supra), and Class A jatos, on the other hand (Item No. 3840, supra).[13] Then, on April 25, 1955, Change 2 to the Freight Classification Guide was issued showing the following nomenclature and NMFC item numbers for jatos :

The Navy Freight Classification Guide (Navsanda Publication 237) shows a somewhat similar treatment of these items. However, since at least June 1955, the Navy has consistently distinguished between Class A and Class B jatos. For example, in September 1955, the Navy Freight Classification Guide provided as follows:

*287

Also, at September 22,1955, the Navy Ordnance Shipping Handbook showed the following information:

12. The uncertainty as to the proper classification of jatos was not confined to the armed services. Prior to 1957, the National Classification Board[14] of the motor carrier industry, and its individual members, had numerous conferences *288 with representatives of the armed services regarding the proper description for rocket ammunition. By late 1954, this activity had resulted, inter alia, in an amendment to NMFC Item No. 3870 whereby the words “Locket Motors” were added to the existing words “Cartridges cannon, blank.” With regard to the designation jato, however, the confusion persisted, and on March 29,1957, pursuant to the request of a carrier, a hearing was held before the Board devoted entirely to an analysis of the jato. At that hearing, representatives of the armed services took the position that a rocket motor should properly be rated as a Class B explosive; that the jato was simply a form of rocket motor; that it was not a high explosive but operated on the principle of rapid burning of gases with no more explosive risk than any rocket motor; and that therefore the jato properly fell in the category of Class B explosive. No representation was made to the Board that a Class A explosive might be involved.
Shortly thereafter, on April 23,1957, the National Classification Board issued a bulletin to the Weighing, Inspection and Lesearch Bureaus entitled “Le: Jet Thrust Units (Jato).” This bulletin read:
Many carriers have inquired of the Board for advice as to the proper Classification description and ratings applicable to Jato Units. These inquiries have been prompted by the practice of the military services describing them on bills of lading as Locket Motors or the fact that the General Accounting Office is authorizing payment of freight charges only on that basis.
This Board first had occasion on December 13, 1950, to express its opinion as to the matter of applicable ratings and at that time stated it considered those for High Explosives, NOI, or Fireworks, NOI to be applicable, according to whether they were classed as Class A or Class B explosives respectively.
That advice was prior to the establishment in the Classification of a provision for Locket Motors. Locket Motors are identified as the component which propels the rocket and is assembled to the rear of the head, and consists of a steel tube which is closed at the forward end by its attachment to the head. In some types of motors the tube is constricted at the rear end to form the throat of a single nozzle — in other types there are sev *289 eral nozzles. These motors contain the propelling charge, the propelling charge support and the igniter. The flight of the completed rocket (motor and head combined) is stabilized by fins attached to the end of the motor, or by the rotation of the rocket about its axis, called spin — the spinning being produced by the reaction of the gas passing through the nozzle. The Classification item for Kocket Motors was established to cover such articles as just described.
Jet thrust or Propulsion Units (Jato) consist of a combustion chamber (body) containing a propellant charge of chemicals, means for ignition and one or more nozzles to control the products of combustion produced when the propellant burns, producing a thrust which continues till the propellant is consumed.
Jato Units are today used to assist aeroplanes to take off; to propel large missiles and to drive moving targets for practice firing.
From the foregoing it will be seen that the purpose or function of Eocket Motors and Jato Units are the same. So far as we can determine their physical characteristics are very similar and differ only m two respects: (1) minor differences in the means of attaching to, combining with, or installation in the device with which they are to be used, and (2) Nomenclature in various technical and supply manuals of the Military Services.
In light of the foregoing, this Board is of the opinion the ratings for Eocket Motors are properly applicable to Jato Units, on shipments that have moved since December 28, 1954, at which time the entry for Kocket Motors was established.
As further information, Subject 76 Docket 78 is a proposal to specifically name Jato in the Classification. Disposition of that Subject will shortly be issued and you will be shown as a party of record to receive a copy.
However, on November 7, 1957, the National Classification Board canceled its April 23 bulletin and issued another bulletin to the Weighing, Inspection and Eesearch Bureaus, reading:
Under date of April 23, 1957, this Board issued a bulletin regarding Jet Thrust Units (J ato) setting forth certain facts which served to act as the basis for its conclusion expressed therein that such articles are ratable, since December 28,1954, as Eocket Motors, item 3870 of the Classifications.
*290 Under date of May 15, 1957, the Board released its Notice of Disposition on Subject 76, Docket 78, recommending the amendment of item 3870 so as to specifically include Jet Thrust or Propulsion Units (Jato). The Board’s disposition was appealed to the National Classification Committee: and m the course of hearings conducted by that body and in corresponding, it has become apparent to the Board that it had not been furnished complete facts as to the nature or character of many articles being shipped by or for account of various Governmental Agencies variously identified or described for billing purposes as “Jato.” It now appears that there exists in the minds of many a complete state of confusion as to what are and are not properly identifiable as Jato units or Rocket Motors.
Under the circumstances the Board hereby cancels its bulletin of April 23, 1957; and until such time as the Board is in possession of complete information as to the nature of various articles involved, no opinion will be expressed by the Board. Efforts are being made by the Board to obtain such data.
13. On November 6 and 7, 1957, a conference was held in the Office of the Assistant Secretary of Defense, Supply and Logistics Cataloging Division, at which time it was agreed by the Army, Navy, and the Air Force that the name “Jato Unit” would be replaced by the names “Rocket Motor” and “Rocket Engine.” A “Rocket Motor” would carry a solid oxidizer-fuel combination while a “Rocket Engine” would utilize liquid fuels and oxidizers. A conference memorandum dated February 7,1958, was forwarded to the Secretary, Ordnance Technical Committee, which referred to the above agreement between the armed services and then continued with the following statement:
The Guided Missiles Systems Branch of the Research and Development Division, Office of the Chief of Ordnance has incorporated in recent technical committee actions on nomenclature, the use of the words “rocket motor” for such units that were formerly designated “jato unit”. All reference to a jato unit indicating a propulsion unit for assist takeoff to aircraft, propelling of explosives across land, launching or sustaining of guided missiles, and acceleration or deceleration of material will cease and the units will be called “rocket motor”.
*291 As a result of the conference, Army Cataloging Handbook H6-1 was amended March 1, 1958,[15] to eliminate the name “Jato Unit” and to replace it by the name “Bocket Motor.” The name “Bocket Motor” was defined as:
A nonairbreathing reaction propulsion device that consists essentially of a thrust chamber (s) and exhaust nozzle (s), and that carries its own solid oxidizer-fuel combination from which hot gases are generated by combustion and expanded through a nozzle (s). It may be empty or contain a simulated and/or inert load.
During 1958, further hearings were held before the National Classification Board. As a result of these hearings, the Board amended the National Motor Freight Classification, effective February 5, 1959, so as to prescribe specific ratings on jatos and Jet Thrust Units, Class A and Glass B, as well as on rocket motors Class A and Class B.
14. As will be observed from the following table, the great majority of the 80 shipments here in controversy comprised the jato known as “Jato Unit M5.”

Number of shipments Type

1 _______________Jato Unit — 0.7-ES-2650-M3.
3 _______________Jato Unit 14-DS-1000-MK4-Mod. 2.
4 _______________Jato Unit 15-KS1000-MK6-Mod. 1.
2 _______________Jato Unit 14-DS-1000-M-8.
2_______________Jato XM30 — 'Solid Sustainer Motor.
68______________Jato M5, XM5, M5E1.
The M5 jato is a component part of the Nike-Ajax Missile Ml for which it provides initial thrust at launching. It *292 is listed in Army Technical Manual TM-9-1970-2 as one of the “Explosive Components” of the Nike-Ajax and is described therein as follows:
The jato unit is a rocket motor consisting of a removable steel head, a cylindrical steel body containing a propellant grain, and a nozzle welded to the aft end of the body. The propellant grain is initiated by an igniter installed in the head of the jato unit. Three fins located at 120° intervals around the nozzle provide stability in flight for the missile-jato combination.
After noting that the drivers of vehicles transporting explosive components of the Nike-Ajax must be informed of the nature of the cargo and its potential fire hazards, TM9-1970-2 goes on to require that jato M5 shipments be placarded “Explosive” and marked with the I.C.C. nomenclature of “ Jet Thrust Unit, Class A Explosive.”[16] The wooden crate for the jato M5 was required to be painted olive-drab, which is the Army color scheme for “High Explosive.” The Army Freight Classification Guide (CTB No. 42) required that the jato M5 be described on bills of lading as “Jet thrust unit (Jato) Class A (rocket motor) ” and that NMFC Item No. 3870 was applicable.
There are four kinds of “ J ato Unit M5” ranging in gross weight from 1848 pounds to 2600 pounds, in weight of explosive from 750 pounds to 752.20 pounds, in length from 150 inches to 175% inches, in width from 24% inches to 41% inches and in height from 26% inches to 45% inches.
15. The other types of jatos carried by plaintiff (except for the experimental model XM30) are referred to in the Department of the Army Supply Manual SM9-5-1340, dated November 17, 1955. This manual is a stock list of items headed “Sockets and Socket Ammunition”, and jatos and rocket motors are treated separately therein. It states that the markings required by I.C.C. regulations must be shown on all outer containers, on shipping orders, bills of lading, and all other shipping papers. JATOS M3, MK4 mod 2, MK6 mod 1, and MK8 are all required to be marked “jet *293 thrust units class a” and placarded “explosives”. On the other hand, rocket motors of various sizes are all required (with one exception) to be marked “rocket ammunition without projectiles” and placarded “dangerous”. The exception referred to is the 762-millimeter rocket motor which consists, among other components, of 1 jato M6 and 8 jatos M7. The marking required for that item is “jet thrust UNITS, CLASS A”.
By Changes No. 1 to the aforesaid Supply Manual under date of December 27, 1956, the required markings for the said jatos were changed to read “jet thrust units explosive”. The required markings for the 762-millimeter rocket motors were likewise changed, but no change was made in the markings required for the other rocket motors.
16. Department of the Navy Ordnance Pamphlet OP-1631 (First Edition, dated March 29, 1957 and Second Edition dated May 15, 1961) contains general information relating to (1) shipping and stowage data and (2) hazard classifications. It treats jatos and rocket motors separately. However, except for one type of rocket motor, it lists the I.C.C. hazard classification as “B” and the kind of hazard as “Fire” for all jatos and all rocket motors.
17. The parties have agreed that if plaintiff is correct in its interpretation of the proper tariff provision to be applied to the shipments in question, plaintiff is due from defendant the sum of $14,394.62, but if defendant is correct in its interpretation of the proper tariff provision to be applied to the shipments in question, then plaintiff is due from defendant only the sum of $1,696.71.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that, defendant being correct in its interpretation of the proper tariff provision to be applied to the shipments in question, plaintiff is entitled to recover from defendant only the sum of $1,696.71. It is, therefore, adjudged and ordered that plaintiff recover of and from the United States the sum of one thousand six hundred ninety-six dollars seventy-one cents ($1,696.71).

 There are 16 other cases involving the same issue now pending in the Court of Claims awaiting the final outcome of the present suit.

 Counsel for the parties have succeeded in eliminating five of these shipments from this controversy so that 80 of the shipments now remain in dispute.

 Counsel for both parties are in full agreement that the doctrine of primary jurisdiction as defined in United States v. Western Pacific Railroad Co., 352 U.S. 59 (1956) is not applicable here since, as they have defined the issue between them, the tariff interpretation question involved is not intertwined with the reasonableness of the rates.

 During an early part of the period here involved, the freight classification guides issued by the Army, Navy, and Air Force had listed Class A jatos under still another nmfc item number, namely, Item No. 3840 which, under the general heading of Ammunition, reads “Bombs or mines”. (See finding 11, infra.) In this litigation neither party claims that Item No. 3840 is applicable to the shipments in question.

 This same issue is involved in 16 other petitions filed in the Court of Claims by other common carriers. In pretrial proceedings herein consideration was given to the entry of a consolidation order covering all such cases. However, although the basic issue is the same, there are minor factual differences between the cases, and it was, therefore, concluded that their consolidation for trial would probably result in needless complexities and some confusion. Counsel for both parties, with the approval of the commissioner, have agreed that the present suit may be regarded as a test case for the resolution by the court of the basic legal issue involved in all these cases.

 The parties have stipulated that there is no controversy with respect to bills of lading numbered AF-9118338, N-30451649, N-30451650, N-30451653 and N-30472390; and that bill of lading No. N-30472387 is in dispute only to the extent that it describes a Class A article.

 Item 3810 states that “Subject to Rule 27, except that Section 73.7 of Motor Carriers’ Explosives and Dangerous Articles Tariff No. 8, American Trucking Associations, Inc., Agent, ME-I.C.C. No. 5, supplements thereto or reissues thereof, in so far as it authorizes shipments to be made in accordance -with regulations of the United States Army, Air Eorce, Navy or Marine Corps, shall be applicable only to Vol. or TL shipments.”

 Rule 27 is headed explosives and dangekous articles and states that “Requirements for movement of explosives and dangerous articles other than explosives shall be governed by the Rules and Regulations as prescribed in Motor Carriers’ Explosives and Dangerous Articles Tariff No. 8, American Trucking Associations, Inc., Agent, ME-I.C.C. No. 5, supplements thereto and reissues thereof.”

 A “Freight Classification” is properly defined as a publication containing a list of articles and the classes to which they are assigned for the purpose of applying class rates, together with governing rules and regulations. The classifying of freight is the process of dividing the many different varieties of freight into a limited number of classes or groups, so as to simplify the quoting of freight rates. When the thousands of different articles shipped by freight are so grouped, the carriers, instead of fixing a separate rate for each individual article, fix rates for the limited number of classes. All items in a given class bear the same rate.

 A “Class Rating” is properly defined as the class or group to which an article is assigned for the purpose of applying class rates. The rating is usually stated in percentages, which are applied to the first class or class 100 rate between origin and destination. A “Class Rate” is properly defined as a rate applicable to a class rating to which articles are assigned in a classification. The class rates are published in a tariff applying between the origin and destination of the shipment, and are usually stated in cents per 100 pounds.

 Sections 73.53(t) and 73.88(e) of Motor Carriers’ Explosives and Dangerous Articles Tariff No. 9, effective February 1, 1957, show that Jet thrust units, Class A and B, were also used to propel large missiles and to drive moving targets for practice firing in addition to being used to assist aeroplane^ to talie off.

 The packing instructions for Class B jatos do not differ materially from those applicable to Class A jatos as set forth in Section 73.79, supra.

 Although no specific reason was assigned by the Guide for this distinction, the inference is clear that It was based upon a difference in the explosive characteristics of the propellants contained in the articles to be shipped. See finding 7, supra.

 The function of the National Classification Board is to formulate and keep up to date a nationwide classification of freight moving by the motor common carriers. In addition to formulating classifications, the Board furnishes its interpretation of applicable classifications and ratings to the carriers, shippers, and other interested parties. It is an agency of, and supported by, the motor carriers in interstate commerce. When considering a new classification or rating, the Board gives consideration to a number of factors bearing on the revenues of the carriers, the most important of which are the density of the new article, its value per pound, its inherent nature for injuring other freight (or being itself injured by other freight), its relative position with respect to competitive articles, and its hazard to the carrier and to the public.

 Meanwhile, Handbook H6-1 had been revised as of January 1, 1958. Despite the agreement reached at the conference of November 6 and 7, 1957, the revised handbook continued to treat jatos and rocket motors separately. It carried the following descriptions of the articles : jato unit.
An item, consisting of one or more continuous type combustion units closed at one end, with a nozzle type opening(s) at the other end containing a propelling charge which, when ignited, creates a gas pressure that is expelled through the nozzle (s), exerting propulsion action. The item is normally used to assist the initial action of the main propulsion unit(s). For similar items open at both ends, see motor (2) (as modified). motor.
*****
2. An item consisting of one or more continuous type combustion units designed to be closed at one end by attachment to a rocket head (and/or other units) with a nozzle type opening(s) at the other end. It is designed to contain a propelling charge which when activated creates a gas pressure that is expelled through the nozzle(s) exerting a propulsion action. When empty or inert loaded it may be used for training purposes.

 On August 11, 19614 the Manual was amended to change the nomenclature to “Jet Thrust Unit, Class B Explosive” and the required placard to “Dangerous.”